**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

SUNCOAST WATERKEEPER,

        Plaintiff,

   v.

SUNCOAST METALS, LLC. and PARADISE
PROPERTIES OF LONGBOAT KEY, LLC,

        Defendants.

Civil Case No.: 8:21-cv-144

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

SUNCOAST WATERKEEPER ("Suncoast Waterkeeper" or "Plaintiff"), by and through its counsel, hereby alleges:

**I.      JURISDICTION AND VENUE**

4.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

5.      On July 31, 2020, Suncoast Waterkeeper issued a 60-day notice letter ("First Notice Letter") to Suncoast Metals, LLC and Paradise Properties of Longboat Key, LLC ("Defendants"), for a Facility under their control with a Facility ID of FLR05G400, as listed

on documents submitted to the Florida Department of Environmental Protection. The First Notice Letter informed Defendants of their violations of United States Environmental Protection Agency's ("USEPA") Multi-Sector General Permit issued on September 29, 1995 (60 Fed. Reg. 50804) and subsequent corrections and modifications as amended on February 9, 1996 (61 Fed. Reg. 5248), February 20, 1996 (61 Fed. Reg. 6412), August 7, 1998 (63 Fed. Reg. 42534), September 30, 1998 (63 Fed. Reg. 52430), and January 19, 1999 (64 Fed. Reg. 2898) (hereinafter collectively referred to as the "MSGP") and the Clean Water Act at the following facility: Suncoast Metals, LLC facility, located at 2050 51st Street, Sarasota, Florida 34234 ("the 2050 Facility"). The First Notice Letter informed Defendants of Suncoast Waterkeeper's intent to file suit against Defendants to enforce the MSGP and the Clean Water Act.

6.      The First Notice Letter was sent to Defendants Daniel C. Fangmeyer, Manager of Suncoast Metals, LLC and Manager of Paradise Properties of Longboat Key, LLC, and Michael Allen, Vice President of Suncoast Metals, LLC, as required by 40 C.F.R. § 135.2(a)(2). The First Notice Letter was also sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IV, the Secretary of the Florida Department of Environmental Protection, and the Director if the Southwest District of the Florida Department of Environmental Protection as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The First Notice Letter is attached hereto as **Exhibit A** and is incorporated herein by reference.

7.      On November 12, 2020, Suncoast Waterkeeper issued a 60-day notice letter ("Second Notice Letter") to Suncoast Metals, LLC and Paradise Properties of Longboat Key,

LLC ("Defendants"), for a Facility under their control located at 2060 51st Street, Sarasota,

Florida 34234 (hereafter the "2060 Facility"). The Second Notice Letter informed

Defendants of their violations of United States Environmental Protection Agency's

("USEPA") Multi-Sector General Permit issued on September 29, 1995 (60 Fed. Reg. 50804)

and subsequent corrections and modifications as amended on February 9, 1996 (61 Fed. Reg.

5248), February 20, 1996 (61 Fed. Reg. 6412), August 7, 1998 (63 Fed. Reg. 42534),

September 30, 1998 (63 Fed. Reg. 52430), and January 19, 1999 (64 Fed. Reg. 2898)

(hereinafter collectively referred to as the "MSGP") and the Clean Water Act at the facility.

The Second Notice Letter informed Defendants of Suncoast Waterkeeper's intent to file suit

against Defendants to enforce the MSGP and the Clean Water Act.

8.      The Second Notice Letter was sent to Defendants Daniel C. Fangmeyer,

Manager of Suncoast Metals, LLC and Manager of Paradise Properties of Longboat Key,

LLC, and Michael Allen, Vice President of Suncoast Metals, LLC, as required by 40 C.F.R.

§ 135.2(a)(2). The Second Notice Letter was also sent to the Administrator of the United

States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IV, the

Secretary of the Florida Department of Environmental Protection, and the Director if the

Southwest District of the Florida Department of Environmental Protection as required by

Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The First Notice Letter is attached

hereto as **Exhibit B** and is incorporated herein by reference.

9.      More than sixty (60) days have passed since the First and Second Notice

Letters were served on the Defendant and the State and Federal agencies. Suncoast

Waterkeeper is informed and believes, and thereon alleges, that neither the EPA nor the State

of Florida has commenced or is diligently prosecuting an action to redress the violations

alleged in the First Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This

action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33

U.S.C. § 1319(g).

10.     Venue is proper in the Middle District of Florida pursuant to Section 505(c)(1)

of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within

this judicial district.

## II.      INTRODUCTION

11.     With every rainfall event, hundreds of millions of gallons of polluted

rainwater, originating from industrial operations such as the 2050 Facility and 2060 Facility

(collectively "Combined Facility") referenced herein, pour into the storm drains and local

waterways. The consensus among regulatory agencies and water quality specialists is that

stormwater pollution accounts for more than half of the total pollution entering marine and

river environments each year. These surface waters, known as Receiving Waters, are

ecologically sensitive areas. Although pollution and habitat destruction have drastically

diminished once-abundant and varied fisheries, these waters are still essential habitat for

dozens of fish and bird species as well as macro-invertebrate and invertebrate species.

Stormwater and non-stormwater contain sediment, heavy metals, such as aluminum, iron,

chromium, copper, lead, mercury, nickel, and zinc, as well as, high concentrations of nitrate

and nitrite, and other pollutants. Exposure to polluted stormwater harms the special aesthetic

and recreational significance that the surface waters have for people in the surrounding

communities. The public's use of the surface waters exposes many people to toxic metals and

other contaminants in stormwater and non-stormwater discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

12.     High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

13.     Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

14.     This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for

Defendants' substantive and procedural violations of the MSGP and the Clean Water Act resulting from Defendants' operations at the Combined Facility.[1]

15.     Suncoast Waterkeeper specifically alleges violations regarding Defendants' discharge of pollutants from the Combined Facility into waters of the United States; violations of the filing, monitoring and reporting; violations of the MSGP's requirements to conduct adequate comprehensive site compliance evaluations, and violations of other procedural and substantive requirements of the MSGP and the Clean Water Act, are ongoing and continuous.

## III.     PARTIES

### A.     Suncoast Waterkeeper

16.     Suncoast Waterkeeper is a non-profit 501(c)(3) non-profit public benefit corporation organized under the laws of the State of Florida. Suncoast Waterkeeper's address is P.O. Box 1028, Sarasota, FL 34230.

17.     Suncoast Waterkeeper has members who live and/or recreate in and around Sarasota, including on and near Whitaker Bayou and Sarasota Bay. Suncoast Waterkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, Suncoast Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself, its members and others. Suncoast Waterkeeper has been registered as a non-profit corporation in Florida since 2012

---

[1] The Combined Facility is fully described in Section V below.

and has maintained its good and current standing in Florida since that time.  Suncoast Waterkeeper is a licensed member of Waterkeeper Alliance, Inc., an international non-profit environmental organization, made up of over 300 separate Waterkeeper programs, such as Suncoast Waterkeeper.

18.     Suncoast Waterkeeper members live, work, travel near, recreate in, use and enjoy the waters near the Facility, including Whitaker Bayou and Sarasota Bay for fishing, boating, body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation.

19.     Discharges of polluted storm water and non-storm water from the Facility degrade water quality and harm aquatic life in Whitaker Bayou and Sarasota Bay, and impair Suncoast Waterkeeper's members' use and enjoyment of those waters.

20.     The violations of the MSGP and Clean Water Act at the Combined Facility are ongoing and continuous. Thus, the interests of Suncoast Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the MSGP and the Clean Water Act.

21.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

**B.     The Suncoast Metals Combined Facility Owner and/or Operator**

19.     Suncoast Waterkeeper is informed and believes, and thereon alleges, that Defendants are the owners of the Combined Facility.

20.     Suncoast Waterkeeper is informed and believes, and thereon alleges, that

Defendants are the operators of the Combined Facility.

21.     Suncoast Waterkeeper is informed and believes, and thereon alleges, that Defendants are active corporations registered in Florida.

22.     Suncoast Waterkeeper is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Suncoast Metals LLC and Paradise Properties of Longboat Key LLC is both Daniel C. Fangmeyer, 2050 51st Street, Sarasota, FL 34234.

## IV.     STATUTORY BACKGROUND

23.     Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The CWA prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311. *Black Warrior Riverkeeper, Inc. v. U.S Army Corps of Eng'rs*, 833 F.3d 1274, 1277 (11th Cir. 2016). The CWA is largely administered through the National Pollutant Discharge Elimination System ("NPDES") permit program, which includes regulation of storm water discharges. 33 U.S.C. § 1342(p); Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987). The Clean Water Act provides that "the discharge of any pollutant by any person shall be unlawful" unless the discharger is in compliance with the terms of an NPDES permit. 33 U.S.C. § 1311(a)*; see also* 33 U.S.C. § 1342(p) (requiring NPDES permit issuance for the discharge of stormwater associated with industrial activities); *Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1216 (11th Cir. 2009) (the CWA "bans the 'discharge of any pollutant' without a [NDPES] permit."); *and Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 53 (1987).

24.     The United States Environmental Protection Agency ("USEPA") has delegated to the state of Florida, and in turn to the Florida Department of Environmental Protection ("DEP"), authority to implement the NPDES program in Florida. Pursuant to Florida Administrative Code ("F.A.C.") Rule 62-621.300(5)(a), Florida adopted and requires that discharge of industrial stormwater be in compliance with the USEPA Multi-Sector General Permit issued on September 29, 1995 (60 Fed. Reg. 50804) and subsequent corrections and modifications as amended on February 9, 1996 (61 Fed. Reg. 5248), February 20, 1996 (61 Fed. Reg. 6412), August 7, 1998 (63 Fed. Reg. 42534), September 30, 1998 (63 Fed. Reg. 52430), and January 19, 1999 (64 Fed. Reg. 2898) (hereinafter collectively referred to as the "MSGP").[2]

25.     The MSGP requires the use of Best Management Practices ("BMPs") that prohibit the discharge of toxic and non-conventional pollutants above levels commensurate with application of the best available technology economically achievable ("BAT"), and that prohibit the discharge of conventional pollutants above levels commensurate with application of the best conventional pollution control technology ("BCT").[3] *See* 60 Fed. Reg. at 50812 ("The conditions of this permit have been designed to comply with the technology-based standards of the CWA (BAT/BCT) . . . The pollution prevention or BMP requirements in this permit operate as limitations on effluent discharges that reflect the application of BAT/BCT."); *see also* MSGP § XI.N.3.a.3, 60 Fed Reg. at 51190 (requiring each facility to

---

[2] All references to specific parts of the MSGP in this letter shall be to 60 Fed. Reg. 5004 unless otherwise indicated.
[3] See CWA section 304(b)(2), (b)(4), 33 U.S.C. § 1314. Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand, and fecal coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. *Id*.; 40 C.F.R. § 401.15.

implement appropriate stormwater management controls). Any discharges of industrial storm water are conditioned on compliance with the terms of the MSGP. Each of the MSGP permit terms constitutes an "effluent limitation" within the meaning of CWA section 505(f), 33 U.S.C. § 1365(f).

26.     "The CWA authorizes citizen suits for the enforcement of all conditions of NPDES permits." *Parker v. Scrap Metal Processors, Inc.* (11th Cir. 2004) 386 F.3d 993, 1008 (quoting *Culbertson v. Coats Am., Inc.*, 913 F. Supp. 1572, 1581 (N.D. Ga. 1995)); 33 U.S.C. §§ 1365(a), (f). "[T]he CWA imposes strict liability for NPDES violations and neither the CWA nor its implementing regulations contain an exception for 'de minimis' violations." *Envtl. World Watch, Inc. v. Walt Disney Co.* (C.D.Cal. Apr. 9, 2014, No. CV 09-04045 DMG (PLAx)) 2014 U.S.Dist.LEXIS 185189, at *47 (citing *Alabama Power Co. v. Costle*, 636 F.2d 323, 360, 204 U.S. App. D.C. 51 (D.C. Cir. 1979).) Further, citizen plaintiffs are entitled to a recovery of reasonable attorneys' fees and litigation costs incurred enforcing the CWA, its implementing regulations, and permits. *See*, *Suncoast Waterkeeper v. City of St. Petersburg*, 2020 U.S. Dist. LEXIS 54877; 33 U.S.C. § 1365(d).

## V.     STATEMENT OF FACTS

### A.  The Suncoast Metals 2050 Facility Site Description

27.     On information and belief, Noticing Party believes that the Combined Facility is to be treated as the same facility.

28.     The 2050 Facility is located at 2050 51st Street, Sarasota, Florida 34234. Suncoast Waterkeeper is informed and believes, and thereon alleges that and consists of approximately 1.64 acres.

29.     According to its website, the Combined Facility is open Monday – Friday from 7:30 am –5:00 pm, and Saturday from 8:00 am – 2:45.

30.     The Facility's Notice of Intent to Use Multi-Sector Generic Permit for Stormwater Discharge Associated With Industrial Activity ("NOI") certifies that the Facility is classified under Standard Industrial Classification ("SIC") Code 5093 meaning that it is primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials.

31.     The Facility ID for the Facility on documents submitted to the DEP is FLR05G400.

32.     Suncoast Waterkeeper is informed and believes, and thereon alleges that the Facility receives a variety of waste materials, primarily ferrous and non-ferrous metals, and stores, processes, crushes, compacts, and in some cases shreds these materials.

33.     Suncoast Waterkeeper is informed and believes, and thereon alleges that the Facility discharges industrial stormwater pursuant to the MSGP into an unnamed drainage ditch adjacent to the Facility, which the NOI identifies as the Receiving Waters for the Facility. Very little information is available in the Facility SWPPP as regards the receiving waters. The SWPPP identifies that the drainage ditch merges with Pearce Canal. Satellite imagery shows that the ditch meets Pearce Canal close to the east side of U.S. 301, also known as Washington Boulevard, where it flows west underneath U.S. 301 and then bears southwest to Whitaker Bayou.

34.     Upon information and belief, it appears that the Facility discharges to Pearce Canal, which flows into/becomes Whitaker Bayou, Sarasota Bay, and ultimately to the Gulf

of Mexico ("Receiving Waters").

35.     Pearce Canal, Whitaker Bayou, and Sarasota Bay are waters of the United States within the meaning of the CWA, and which, on information and belief, receive discharged effluent from the Facility.

36.     Suncoast Waterkeeper is informed and believes, and thereon alleges, that storm water falling on the Facility roof is discharged through gutters and downspouts and join storm water flow patterns to the discharge points. Large quantities of exposed metals and scrap materials are visible from recent satellite imagery.

37.     Suncoast Waterkeeper is informed and believes, and thereon alleges, that the Facility's areas described herein, lack adequate cover, secondary containment, or treatment; and certain industrial activities occur outside without adequate cover, secondary containment, or treatment; resulting in discharges of polluted stormwater. Vehicle and other traffic at the Facility track dust and particulate matter, increasing the discharge of polluted water, sediments and debris into waters of the United States.

**B.  The Suncoast Metals 2060 Facility Site Description**

38.     The 2060 Facility is located at 51st Street, Sarasota, Florida 34234.

39.     The Suncoast Metals website does not treat the 2060 Facility and 2050 Facility differently. According to its website, the Combined Facility is open Monday – Friday from 7:30 am –5:00 pm, and Saturday from 8:00 am – 2:45.

40.     Information available to the Plaintiff, including reports filed with the DEP by Suncoast Metals, indicates that the 2060 Facility does not have any NPDES permit coverage, and that the 2050 Facility MSGP documents to not address the activities at the 2060 Facility.

On information and belief, as of January 19, 2020, no NPDES permit coverage has been issued per a review of the DEP Electronic Document Management System (OCULUS) at https://depedms.dep.state.fl.us/Oculus/servlet/login.

41.     The property at 2060 51st Street in Sarasota, Florida where the 2060 Facility is located is owned by Paradise Properties of Longboat Key, LLC.

42.     On information any belief, the 2060 Facility is engaged in the sorting, recycling, and wholesale distribution of scrap and waste materials, mainly aluminum. A large portion of the property is outdoors, containing large piles of scrap materials such as aluminum, where pollutants are exposed to stormwater. Numerous dumpsters and receptacles are on the property, as well as metal tanks without unknown contents. Several structures at the 2060 Facility house storage and processing centers.

43.     Two hazardous waste permits from DEP have been issued to the 2060 Facility.

44.     On January 5, 2021, Plaintiff is informed and believes that the Owners and/or Operators of the Combined Facility submitted, to the DEP, a written request to modify the MSGP coverage for the 2050 Facility to include the 2060 Facility. Plaintiff alleges such request is insufficient to confer MSGP coverage to the 2060 Facility, or to the Combined Facilities. Rule 62-621.300(5)(f) provides that a facility may obtain MSGP permit coverage "after a complete Notice of Intent is submitted to the Department in accordance with paragraph 62-621.300(5)(c), F.A.C." which in turn states that "Facilities or activities seeking coverage under this generic permit shall apply to the Department on the form referenced in paragraph 62-621.300(5)(b), F.A.C., and in accordance with the Multi-Sector Generic Permit

for Stormwater Discharge Associated with Industrial Activity." Defendants' January 5, 2021 letter to DEP does not complete the required Notice of Intent, and omits information that would have been required and provided by and through a proper Notice of Intent.

45.     In addition to lacking a NPDES permit, information available to Plaintiff indicates that Suncoast Metals has failed to develop and/or implement stormwater management practices and/or structural controls ("best management practices" or "BMPs") to prevent stormwater flows from coming into contact with the sources of contaminants at the 2060 Facility to prevent the discharge of pollutants. Plaintiff alleges that the 2060 Facility lacks sufficient structural controls and practices to: minimize exposure of pollutants to stormwater; retain all stormwater on site; or prevent contaminants from entering into stormwater.

46.     Plaintiff also alleges that Suncoast Metals does not sufficiently treat contaminated stormwater prior to discharge from the 2060 Facility. In addition, the large number of trucks and other vehicles entering and leaving the 2060 Facility from the driveways track pollutants off-site onto public streets where rainfall washes these pollutants into storm drains that discharge into waters of the United States.

47.     Further, information available to Plaintiff indicates that Suncoast Metals has failed to develop and/or implement any Stormwater Pollution Prevention Plans ("SWPPP") and monitoring and reporting programs the 2060 Facility. Therefore, Suncoast Metals is violating Sections 301 and 402 of the Clean Water Act at the 2060 Facility.

**C.     Pearce Canal/Whitaker Bayou/Sarasota Bay**

48.     On information and belief, the Plaintiff alleges that stormwater from the

Combined Facility drains into the Pearce Canal directly South of the 2060 Facility, which is a tributary of Whitaker Bayou, which empties into Sarasota Bay. On information and belief, much of the stormwater "pools" in the middle of yard area of the 2060 Facility, where it then flows west to co-mingle with runoff from the 2050 Facility at the "alley" between the two facilities, before ultimately flowing into Pearce Canal. On information and belief, Plaintiff also alleges that stormwater from the 2060 Facility flows into a storm drain on the southeast corner of the 2060 property on Carmichael Avenue, and thus into the MS4 and ultimately Sarasota Bay.

49.     The State of Florida has identified beneficial uses and designated all surface waters of the State of Florida as Class III – Recreation, Propagation and Maintenance of a Healthy, Well-Balanced Population of Fish and Wildlife, except for certain waters which are described in subsection 62-302.400(16), F.A.C. Rule 62-302.400(15), F.A.C. "Class I, II, and III surface waters share water quality criteria established to protect fish consumption, recreation and the propagation and maintenance of a healthy, well-balanced population of fish and wildlife." Rule 62-302.400(4), F.A.C. Pollution from industrial areas, impairs people's use of the Receiving Waters for these uses.

50.     Whitaker Bayou is listed on the State of Florida's Clean Water Act Section 303(d) list of impaired water bodies. A water body that is listed as impaired cannot support its designated beneficial uses.  The beneficial uses of the Whitaker Bayou include aquatic life (estuarine and freshwater habitat, fish migration, fish spawning, preservation of rare and endangered aquatic species, shellfish propagation,) primary contact and recreation, navigation, and fish consumption. Whitaker Bayou is impaired by Dissolved Oxygen, Fecal

Coliform, Mercury (in fish tissue), and Nutrients.

51.    Sarasota Bay and the tidal portions of Whitaker Bayou that receive polluted stormwater from the Facility have exceptional recreational and ecological significance. Pollution from the Facility damages habitat for commercial fishing and sport fishing, estuarine habitat and wildlife habitat that supports fish migration, fish spawning, preservation of rare and endangered species, shellfish propagation, contact and non-contact water recreation and navigation.

52.    The Sarasota Bay Estuarine System is designated as a "Special Water" having been found to have exceptional recreational or ecological significance and that the environmental, social, and economic benefits of the designation outweigh the environmental, social, and economic costs (Rule 62- 302.700(5), F.A.C.). The Sarasota Bay Estuarine System is also afforded special significance and protection as an "Outstanding Florida Water," pursuant to 62-302.400 F.A.C.

### D.    The 2050 Facility's MSGP Coverage and Violations

53.    Metal recycling facilities, especially those with outdoor stockpiling, processing and segregation of materials, have been identified as a major source of stormwater contamination. Scrap metal in different stages of corrosion and decay may release a variety of harmful substances including but not limited to heavy metals, fuel, oil, lubricants, polychlorinated biphenyls, grease, lead acid, lead oxides, chlorinated solvents, asbestos, ethylene glycol, paint, and chemical residues. 60 Fed. Reg. 50804, 50953–63 (listing common pollutants associated with Sector N—scrap and waste recycling facilities—as of 1995); *see also* id. at 51189–97(outlining special requirements for Sector N); EPA, *Industrial*

*Stormwater Fact Sheet Series:Sector N*, EPA-833-F-06-029, at 2–4 (Dec. 2006),

https://www.epa.gov/sites/production/files/2015-10/documents/sector_n_scraprecycling.pdf

[hereinafter *Sector N Fact Sheet*] (listing common pollutants associated with Sector N, as of

2006).

54.     In addition to the storage and processing of various sources of scrap metal,

such facilities also conduct vehicle operation and maintenance and equipment operation and

storage. Forklifts, trucks, and other vehicles track debris, particulate matter, and other

contaminants to areas on and off the premises. Vehicles also expose many other sources of

pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and

hydraulic fluids.

55.     The types of pollutants that are released into the immediate environment by

scrap metal and metal processing activities include, among those listed above: toxic metals

such as aluminum, copper, iron, lead, zinc, mercury, cadmium; as well as petroleum products

including oil, gasoline, grease, and diesel fuel; battery fluids, acids and solvents; and total

organic carbon, suspended solids, and pH-altering substances. Other significant materials

present at scrap metal facilities, such as the Suncoast Metals Facility, include mineral spirits,

kerosene, paint thinner, water-based machine cutting fluid, waste sand, and machine shop

filings.

### i.  Discharges in Violation of the MSGP

56.    Part XI.N of the MSGP pertains to Sector N facilities[4]—entities, including the 2050 Facility, that discharge stormwater associated with industrial activity from scrap recycling and waste recycling facilities. Part XI.N is divided into three separate classes of recycling facilities. The 2050 Facility falls under the first category: "scrap recycling and waste recycling facilities (non-liquid recyclable waste)." All regulations contained in this Notice of Violations and Intent to File Suit with respect to Part XI.N of the MSGP pertain to this classification of recycling facilities. *See* MSGP § XI.N.3.a., 60 Fed. Reg. at 51189–90 (outlining general and specific requirements for Sector N); MSGP § XI.N.3.a(3)(a), 60 Fed. Reg. at 51190–93 (detailing specific requirements for facilities processing non-liquid recyclable waste).

57.    The MSGP requires dischargers to develop and implement a stormwater pollution prevention plan ("SWPPP"). MSGP § IV. Sector N Facilities such as the 2050 Facility must develop and implement a SWPPP that comports with several requirements of Part XI.N of the MSGP. Through the SWPPP, requirements in Part XI.N implement the MSGP's BAT/BCT requirements for Sector N facilities by requiring that the pollution prevention plan minimize pollution and requiring specific BMPs to effectuate such minimization. *See* MSGP Fact Sheet § VI.B, 60 Fed. Reg. at 50812 ("The pollution prevention or BMP requirements in this permit operate as limitations on effluent discharges that reflect the application of BAT/BCT.")

---

[4] Sector N pertains to facilities with SIC Code 5093. MSGP, Table 4.

58.     For Facilities in Sector N, the MSGP establishes the following cut-off concentrations for pollutants of concern: chemical oxygen demand ("COD") – 120 mg/L, total suspended solids ("TSS") – 100 mg/L, total recoverable aluminum – 0.75 mg/L, total recoverable copper – 0.0636 mg/L, total recoverable iron – 1.0 mg/L, total recoverable lead – 0.0816 mg/L, total recoverable zinc – 0.117 mg/L. MSGP, § XI.N.5.a; 61 Fed. Reg. 5248 (February 9, 1996) (amending cut-off concentration for zinc). The cut-off concentrations are used "to assess the effectiveness of the pollution prevention plan and to help ensure that a reduction of pollutants is realized." 60 Fed. Reg. at 50843 (Monitoring and Reporting Requirements). They "provide a reasonable target for controlling stormwater contamination by pollution prevention plans." *Id*. at 51076. Thus, the cut-off concentrations are guidelines for determining whether a facility has implemented the requisite BAT/BCT level of control measures. Further, exceedances of cut-off concentrations are reason for concern that pollution may have reached a level "at which a stormwater discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish." 60 Fed. Reg. at 50824–25. As described below, the 2050 Facility's own stormwater samples show numerous exceedances of the cut-off concentrations for pollutants of concern.

59. The 2050 Facility has discharged and continues to discharge stormwater with unacceptable levels of TSS, COD, iron, aluminum, zinc, copper, and lead in violation of the MSGP. Suncoast Metals' sampling and analysis results reported to DEP confirm discharges of specific pollutants and materials other than stormwater in violation of the MSGP provisions listed above. Self monitoring reports under the Permit are deemed "conclusive

evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), *vacated on other grounds*, 485 U.S. 931 (1988).

60.     The following discharges of pollutants from the 2050 Facility have violated the aforementioned sections of Part XI.N of the MSGP and are evidence of ongoing violations of Part XI.N of the MSGP.

| Sampling Date | Pollutant of Concern | Observed Concentration (mg/l) | Cut-off Concentration (mg/l) | Outfall (as identified by the Facility) |
|---|---|---|---|---|
| 1/24/2019 | TSS | 114 | 100 | D-001 |
| 7/09/2019 | TSS | 108 | 100 | D-001 |
| 10/24/2017 | TSS | 184 | 100 | D-001 |
| 07/12/2017 | TSS | 113 | 100 | D-001 |
| 1/24/2019 | Aluminum | 4.09 | 0.75 | D-001 |
| 7/09/2019 | Aluminum | 2.08 | 0.75 | D-001 |
| 10/24/2017 | Aluminum | 3.38 | 0.75 | D-001 |
| 07/12/2017 | Aluminum | 2.67 | 0.75 | D-001 |
| 1/24/2019 | Zinc | 0.655 | 0.117 | D-001 |
| 7/09/2019 | Zinc | 1.11 | 0.117 | D-001 |
| 10/24/2017 | Zinc | 0.549 | 0.117 | D-001 |
| 07/12/2017 | Zinc | 0.790 | 0.117 | D-001 |
| 05/24/2017 | Zinc | 0.370 | 0.117 | D-001 |
| 1/24/2019 | Iron | 4.85 | 1.0 | D-001 |
| 7/09/2019 | Iron | 3.83 | 1.0 | D-001 |
| 10/24/2017 | Iron | 3.95 | 1.0 | D-001 |

| 07/12/2017 | Iron | 1.91 | 1.0 | D-001 |
|---|---|---|---|---|
| 1/24/2019 | Copper | 0.282 | 0.0636 | D-001 |
| 7/09/2019 | Copper | 0.144 | 0.0636 | D-001 |
| 10/24/2017 | Copper | 0.160 | 0.0636 | D-001 |
| 07/12/2017 | Copper | 0.137 | 0.0636 | D-001 |
| 1/24/2019 | Lead | 0.243 | 0.0816 | D-001 |
| 7/09/2019 | Lead | 0.117 | 0.0816 | D-001 |
| 10/24/2017 | Lead | 0.104 | 0.0816 | D-001 |
| 07/12/2017 | Lead | 0.986 | 0.0816 | D-001 |
| 1/24/2019 | COD | 236 | 120 | D-001 |
| 7/09/2019 | COD | 184 | 120 | D-001 |
| 10/24/2017 | COD | 126 | 120 | D-001 |
| 07/12/2017 | COD | 191 | 120 | D-001 |
| 05/24/2017 | COD | 164 | 120 | D-001 |

61.     The information in the above table reflects data gathered from the Facility's self-monitoring during 2019 and 2017. On information and belief, Plaintiff alleges that discharges from the 2050 Facility have exceeded and continue to exceed the cutoff concentrations for COD, TSS, copper, zinc, aluminum, iron, and lead.

62. Plaintiff's investigation, including their review of the analytical results documenting pollutant levels in stormwater discharges from the 2050 Facility well in excess of applicable cut-off concentrations, indicates that Suncoast Metals has not developed and/or implemented sufficient BMPs to minimize stormwater flows from coming into contact with the sources of contaminants or otherwise to control the discharge of pollutants from the 2050

Facility. Accordingly, Suncoast Metals has not developed and/or implemented adequate pollution controls to meet BAT/BCT at the 2050 Facility in violation of the MSGP, and has violated and will continue to violate the Clean Water Act each and every day it has failed to develop and/or implement adequate pollution controls to meet BAT/BCT. Each discharge of stormwater from each of the above facilities constitutes a separate violation of the MSGP and the CWA.

63.     Plaintiff alleges that such violations also have occurred and will occur on other rain dates, including on information and belief on the date of every discharge that has occurred at the 2050 Facility since the First Notice Letter was served, and that are ongoing. Appendix I to the First Notice Letter set forth lists of specific rain dates on which Suncoast Metal alleges that the 2050 Facility has discharged stormwater containing impermissible and unauthorized levels of pollutants in violation of Section 301(a) of the CWA as well as Part XI.N of the MSGP.[5] This list of dates is not exclusive.

64.     These unlawful discharges are ongoing. Each discharge of stormwater containing any of these pollutants constitutes a separate violation of the MSGP and the CWA. Each day that one of the Facility operates without implementing BAT/BCT is a violation of the MSGP. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Suncoast Metals is subject to penalties for violations of the MSGP and the CWA since July 31, 2015.

---

[5] The rain dates on the attached tables are all the days when 0.1" or more rain was observed at the nearest weather station to the Facility. Rain data was accessed from the National Oceanic and Atmospheric Administration at https://www.ncdc.noaa.gov/cdo-web/. (Last accessed on July 31, 2020).

ii. **Failure to Prepare, Implement, Review, and Update Adequate Stormwater Pollution Prevention Plans for the 2050 Facility.**

65.     The MSGP requires dischargers to develop and implement a SWPPP that includes potential sources of pollution that may be reasonably expected to affect the quality of stormwater discharges associated with industrial activity from a facility as well as BMPs use to reduce the pollutants in stormwater discharges associated with industrial activity at a facility. MSGP § IV, 60 Fed. Reg. at 51115–18. The MSGP provides that:

> [T]he plan shall describe and ensure the implementation of practices that are to be used to reduce the pollutants in stormwater discharges associated with industrial activity at the facility and to assure compliance with the terms and conditions of this permit. Facilities must implement the provisions of the stormwater pollution prevention plan required under this part as a condition of this permit. *Id.*, 60 Fed. Reg. at 51115.

66.     Part XI.N.3 of the MSGP describes the minimum standard Pollution Prevention Plan Requirements for Sector N facilities such as the 2050 Facility. Facilities subject to Sector N must include, *inter alia*, the following in their SWPPPs: (1) identification of all the members of a stormwater pollution prevention team responsible for developing and implementing the SWPPP; (2) a description of potential pollutant sources; (3) a site map including, *inter alia*, outfall locations, types of discharges in the drainage areas, location where significant materials are exposed to precipitation, monitoring locations, and flow directions; (4) an inventory of the types of materials at the site that may be exposed to precipitation; (5) a list of significant spills and leaks of toxic or hazardous pollutants that occurred at areas that are exposed to precipitation; (6) a summary of existing discharge sampling data; (7) a narrative description of potential pollutant sources from various activities; (8) a

description and implementation of appropriate stormwater management controls (including many specific requirements, detailed below); (9) spill prevention and response measures; (10) a quarterly inspection program; (11) an employee training program; and (12) a supplier notification program. MSGP §§ XI.N.3.a.1, XI.N.3.a.2.a XI.N.3.a.2.e, XI.N.3.a.3.a.i-XI.N.3.a.3.a.xii (requirements for scrap and waste recycling facilities (nonsource-separated, nonliquid recyclable wastes)).

67.     Part XI.N.3.a(3)(a) of the MSGP requires that Section N facilities develop and implement appropriate stormwater management controls including the following:

- measures to minimize contact of stormwater runoff with stockpiled materials, process materials, and nonrecyclable wastes, as well as measures to minimize the extent of stormwater contamination from those areas. The facility operator must consider using the following BMPs or their equivalents: diversion of runoff, media filtration, silt fencing, and oil/water separators, sumps, and dry adsorbents. Part XI.N.3.a(3)(a)(ii).

- "measures necessary to minimize contact of surface runoff with residual cutting fluids." This includes a requirement to consider implementing one of two (or a combination) types of measures – either storage of turnings under cover or a dedicated containment area for turnings. Part XI.N.3.a(3)(a)(iii).

- "measures and controls to minimize residual liquids and accumulated particulate matter, originating from scrap and recyclable waste materials stored indoors or under cover, from coming in contact with surface runoff." This part requires that dischargers consider including various housekeeping measures. Part XI.N.3.a(3)(a)(iv).

- address "areas where scrap and waste processing equipment are sited" by adopting "measures and controls to minimize surface runoff from coming in contact with scrap processing equipment." Part XI.N.3.a(3)(a)(v).

- provide appropriate source control, stabilization measures, nonstructural, structural controls or equivalent for areas at the facilities that are associated with industrial activity that have a high potential for soil erosion and suspended solids loadings. This requires consideration of a variety of erosion and sediment control BMPs. Part XI.N.3.a(3)(a)(vii).

- provide for a detention or retention basin or equivalent when BMPs installed pursuant to Part XI.N.3.a(3)(a)(vii) do not prove sufficient. Part XI.N.3.a(3)(a)(viii). 60 Fed. Reg. at 51190–93 (detailing specific requirements for facilities processing non-liquid recyclable waste).

68.     Part XI.N.3(a)(4) of the MSGP requires that Sector N facilities conduct, at a minimum once per year, comprehensive site compliance evaluations, include those evaluations in the SWPPP, and revised stormwater pollution prevention measures and controls accordingly based on the results of those evaluations.

69.     On information and belief, Plaintiff alleges that Suncoast Metals' SWPPP for the 2050 Facility does not include, and Suncoast Metals has not implemented, the required minimum and industry specific BMPs necessary to reduce pollutant levels in discharges to BAT and BCT levels. This is evidenced by sources of stormwater contamination at the 2050 Facility, contaminant tracking around and off the 2050 Facility, and the 2050 Facility's discharges of stormwater contaminated above pollutant levels without the requisite application of BAT/BCT. Suncoast Metals' failure to prepare and/or implement an adequate SWPPP in all the above respects constitute violations of the MSGP. *See* 60 Fed. Reg. at 50812, 50960 (SWPPP must specify BMPs necessary to attain BAT/BCT levels that are tailored to industry group).

70. Further, on information and belief, Plaintiff alleges that the SWPPP for the 2050 Facility does not identify all stormwater discharge locations, does not describe all pollutant generating activities, and Suncoast Metals has failed to complete the annual comprehensive site compliance evaluations and revise the 2050 Facility's SWPPP accordingly, as required by the MSGP. This is evidenced by sampling of past stormwater

discharges that have occurred at the Facility and continue to exceed cut-off concentrations. Despite the clear BMP requirements in the MSGP, on information and belief, Plaintiff alleges that Suncoast Metals has been conducting and continues to conduct industrial operations at the 2050 Facility with inadequately developed, implemented, and/or revised SWPPPs.

### iii. Failure to Conduct Adequate Comprehensive Site Compliance Evaluations and Take Appropriate Action in Response.

71.     Part XI.N.3.a.4 of the MSGP requires Sector N dischargers to conduct comprehensive site compliance evaluations at least once per year. 60 Fed. Reg. at 51995. This requires a comprehensive review of a facility and its stormwater pollution control measures. The outcome of this evaluation requires revisions to a facility's SWPPP. *Id*. On information and belief, Plaintiff alleges that the 2050 Facility has failed to conduct such evaluations and to then appropriately revise their SWPPPs, as evidenced by their purported failure to respond to the following requests from the DEP:

- A 2019 Stormwater Discharge Monitoring Report (DMR) Acknowledgement Letter sent from DEP to Suncoast Metal regarding 2019 analytical monitoring for the 2050 Facility noted that sampling results for the 1050 Facility exceeded cut-off concentrations for pollutants of concern at the 2050 Facility. This letter requested "appropriate action(s)" to address the exceedances, including, *inter alia*, re-evaluating the effectiveness of the pollution prevention measures and controls identified in the 2050 Facility's SWPPP and documenting the results of this review in the SWPPP.

- On March 06, 2018, DEP sent a letter to Suncoast Metals regarding exceedances of the cut-off concentrations for pollutants of concern at the 2050 Facility. The letter mandated quarterly monitoring during Year 4 of the 2050 Facility's permits cycle, and as well as the implementation of measures to address the exceedances, including, *inter alia*, re-evaluating the effectiveness of the pollution prevention measures and controls identified in the 2050 Facility's SWPPP and documenting the results of this review in the SWPPP.

- On June 23, 2010, DEP sent a letter to Suncoast Metals regarding exceedances a of the cut-off concentrations for pollutants of concern at the 2050 Facility. This letter requested "appropriate action(s)" to address the exceedances, including, *inter alia*, re-evaluating the effectiveness of the pollution prevention measures and controls identified in the Facility's SWPPP and documenting the results of this review in the SWPPP.

72.     Suncoast Metal has violated the MSGP and the CWA each and every day that it operated/operates the 2050 Facility with an inadequately developed, implemented, and/or revised SWPPP in violation of MSGP Part XI.N.3 and XI.N.3.a.4. Suncoast is subject to civil penalties for all violations of the CWA occurring at the Facility since July 31, 2020.

### iv.   **Failure to Develop, Implement, and/or Revise Adequate Monitoring and Reporting Requirements for the 2050 Facility.**

73. The MSGP requires facility operators to implement monitoring and reporting requirements that will allow facility operators to determine whether they have adequately reduced the level of pollutants in stormwater runoff through the development and proper implementation of the facility's SWPPP. For Sector N facilities, the monitoring and reporting requirements are set forth in MSGP Part XI.N.5.

74.     Permittees with scrap recycling and waste recycling facilities must monitor their stormwater discharges at least quarterly during the second and fourth year of the permit term. They must provide "the date and duration (in hours) of the storm event(s) sampled; rainfall measurements or estimates (in inches) of the storm event that generated the sampled runoff; the duration between the storm event sampled and the end of the previous measurable (greater than 0.1 inch (") rainfall) storm event; and an estimate of the total volume (in gallons) of the discharge sampled." MSGP § XI.N.5.a., 60 Fed. Reg. at 51195. They must collect samples during sampling periods of January to March, April to June, July to

September, and October to December.[6] *Id*. at XI.N.5.a(1). Samples must be "collected from the discharge resulting from a storm event that is greater than 0.1" in magnitude and that occurs at least 72 hours from the previously measurable (greater than 0.1" rainfall) storm event." *Id*. at XI.N.5.a.(2).

75.     In addition to analytic monitoring, dischargers must also take quarterly samples and make visual observations of representative discharges. MSGP § XI.N.5.c, 60 Fed. Reg. at 51196–97. Dischargers must document their observations of color, odor, clarity, floating solids, settled solids, suspended solids, foam, oil sheen, and other obvious indicators of stormwater pollution at each discharge location. *Id.* These observations are to be recorded and kept onsite with the SWPPP. *Id.* Based on the results of the analytic and observational monitoring, dischargers are required to evaluate the need for additional BMPs and modifications to the facility's SWPPP. 60 Fed. Reg. at 50820–27, 50829–30.

76. The 2050 Facility has repeatedly violated these monitoring requirements. On information and belief, Plaintiff alleges that the 2050 Facility has often taken stormwater samples on dates that were subsequent to large storm events. This practice which would artificially improve the quality of the sampling results due to obtaining non-representative samples that have benefitting from a flushing of pollutants from recent storm events. On information and belief, Suncoast Metals also frequently reported that no discharges occurred from the 2050 Facility despite evidence of numerous potential sampling events during a given reporting period.

---

[6] Plaintiff refers to these periods as the first, second, third and fourth quarters of a given permit year.

77. On information and belief, Plaintiff alleges that Suncoast Metals failed to accurately report the duration between the storm event it sampled at the 2050 Facility and the end of the previous measurable (greater than 0.1" rainfall) storm event, as required by MSGP Part XI.N.5.a(1):

- Suncoast Metals reported that it sampled a stormwater discharge that occurred on September 09, 2019, and that it had been 3 days since the last storm event with rainfall greater than 0.1". However, on information and belief, Plaintiff alleges that local precipitation data shows that storm events greater than 0.1" occurred at the 2050 Facility when it was operating on September 7, and less than 3 days before September 9, 2019.

- Suncoast Metals reported that a stormwater discharge occurred on May 24, 2017. Suncoast failed, as required, to report either the duration of the storm event or the number of days since the most recent previous storm event.

- Suncoast Metals reported that a stormwater discharge occurred on July 12, 2017. Suncoast failed, as required, to report either the duration of the storm event or the number of days since the most recent previous storm event.

- Suncoast Metals reported that a stormwater discharge occurred on October 24, 2017. Suncoast failed, as required, to report either the duration of the storm event or the number of days since the most recent previous storm event.

78. On information and belief, Plaintiff alleges that Suncoast Metals failed to take and monitor samples from four storm events at the 2050 Facility during 2019 or 2017 consistent with the requirements in MSGP Part XI.N.5.a(2), which requires that, *inter alia*, a discharger take samples from a storm event greater than 0.1" in magnitude and occurring at least 72 hours from the previously measurable (greater than 0.1" rainfall) storm event:

- On information and belief, Plaintiff alleges that local precipitation data shows that a storm event with rainfall greater than 0.1" occurred on September 8, 2019, just 1 day prior to the sampling event on September 9, 2019. On information and belief, Plaintiff allege that during the third quarter of 2019, the following days when the 2050 Facility was operating had storm events greater than 0.1" that were preceded by 72 hours

without storm events greater than 0.1": July 31, August 30, September 9, and September 18.

- On information and belief, Plaintiff alleges that local precipitation data shows that a storm event with rainfall greater than 0.1" occurred on May 22, 2017, just 2 days prior to the sampling event on May 24, 2017. On information and belief, Plaintiff alleges that during the second quarter of 2017, the following days when the 2050 Facility was operating had storm events greater than 0.1" that were preceded by 72 hours without storm events greater than 0.1": May 19, June 23, and June 28.

- On information and belief, Plaintiff alleges that local precipitation data shows that a storm event with rainfall greater than 0.1" occurred on July 11, 2017, just 1 day prior to the sampling event on July 12, 2017. On information and belief, Plaintiff alleges that during the second quarter of 2017, the following days when the 2050 Facility was operating had storm events greater than 0.1" that were preceded by 72 hours without storm events greater than 0.1": August 7, August 17, August 23, September 1, September 6, and September 22.

- On information and belief, Plaintiff alleges that local precipitation data shows that a storm event with rainfall greater than 0.1" occurred on October 23, 2017, just 1 day prior to the sampling event on October 12, 2017. On information and belief, Plaintiff alleges that during the fourth quarter of 2017, the following days when the 2050 Facility was operating had storm events greater than 0.1" that were preceded by 72 hours without storm events greater than 0.1": October 13, October 23, October 28, November 23, and December 8.

79.     On information and belief, Plaintiff alleges that Suncoast Metals failed to take

and monitor samples from four storm events at the 2050 Facility during 2019 consistent with

the requirements in MSGP Part XI.N.5.a. Specifically, Suncoast Metals failed to sample and

report discharges occurring at the Facility during storm events of greater than 0.1" that were

preceded by 72 hours without a storm even greater than 0.1".

- Suncoast Metals failed to sample and report discharge information for the second quarter of 2019, and instead reported that no discharge occurred at the 2050 Facility during that time. On information and belief, Plaintiff alleges that local precipitation data shows that during the second quarter of 2019, the following days when the 2050 Facility was operating experienced storm events greater than 0.1" that were preceded

by 72 hours without storm events greater than 0.1": April 9, April 19, May 2, May 31, June 8, and June 28.

- Suncoast Metals failed to sample and report discharge information for the fourth quarter of 2019, and instead reported that no discharge occurred at the 2050 Facility. On information and belief, Plaintiff alleges that local precipitation data shows that during the fourth quarter of 2019, the following days when the 2050 Facility was operating experienced storm events greater than 0.1" that were preceded by 72 hours without storm events greater than 0.1": December 14, and December 28.

- Suncoast Metals failed to sample and report discharge information for the first quarter of 2017, and instead reported that no discharge occurred at the 2050 Facility. On information and belief, Plaintiff alleges that local precipitation data shows that during the first quarter of 2017, the following days when the 2050 Facility was operating experienced storm events greater than 0.1" that were preceded by 72 hours without storm events greater than 0.1": January 7, February 8, February 18, and March 13.

80.     The failure to collect and monitor stormwater samples from the requisite storm events at the 2050 Facility and to accurately report storm event information results in at least 11 violations of the MSGP. These violations of the MSGP are ongoing. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Suncoast Metals is subject to penalties for violations of the MSGP and the CWA's monitoring and sampling requirements since at least July 31, 2015.

**C. The 2060 Facility's MSGP Coverage and Violations**

81.     Metal recycling facilities, especially those with outdoor stockpiling, processing and segregation of materials (Non-Source Separated Facilities), have been identified as a major source of stormwater contamination. Scrap metal in different stages of corrosion and decay may release a variety of harmful substances including but not limited to heavy metals, fuel, oil, lubricants, polychlorinated biphenyls, grease, lead acid, lead oxides, chlorinated solvents, asbestos, ethylene glycol, paint, and chemical residues. 60 Fed. Reg.

50804, 50953–63 (listing common pollutants associated with Sector N—scrap and waste recycling facilities—as of 1995); *see also* id. at 51189–97 (outlining special requirements for Sector N); EPA, *Industrial Stormwater Fact Sheet Series: Sector N*, EPA-833-F-06-029, at 2–4 (Dec. 2006), https://www3.epa.gov/npdes/pubs/sector_n_scraprecycling.pdf [hereinafter *Sector N Fact Sheet*] (listing common pollutants associated with Sector N, as of 2006).

82.     The types of pollutants that are released into the immediate environment by scrap metal and metal processing activities include, among those listed above: toxic metals such as aluminum, copper, iron, lead, zinc, mercury, cadmium; as well as petroleum products including oil, gasoline, grease, and diesel fuel; battery fluids, acids and solvents; and total organic carbon, suspended solids, and pH-altering substances. Other significant materials present at scrap metal facilities include mineral spirits, kerosene, paint thinner, water-based machine cutting fluid, waste sand, and machine shop filings.

83.     In addition to the storage and processing of various sources of scrap metal, such facilities also conduct vehicle operation and maintenance and equipment operation and storage. Forklifts, trucks, and other vehicles track debris, particulate matter, and other contaminants to areas on and off the premises. Vehicles also expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

84.     Recycling facilities that process source-separated, recyclable materials primarily non-industrial and residential sources (Source Separated Facilities), have been identified as a major source of stormwater contamination. The facility may unknowingly accept nonrecyclable materials or household hazardous waste. Outdoor storage can lead to

release of various chemicals including TSS, BOD, COD, nitrite plus nitrate, TKN, phosphorus, oil and grease, and aluminum, as can the indoor release into drains, and vehicle maintenance. 60 Fed. Reg. 50804, 50959–65 (listing common pollutants associated with Sector N—recycling facilities (Source Separated Facilities) —as of 1995); *see also id*. at 51189–97 (*Sector N Fact Sheet.)*

### i.  Failure to Obtain a NPDES Permit

#### 1.  Suncoast Metals is required to have CWA coverage for the 2060 Facility.

85.     Storm water discharges "associated with industrial activity" are unlawful in the absence of an NPDES permit. *See* CWA § 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B). As noted, in Florida, the DEP has issued a single, statewide permit applicable to all storm water discharges associated with industrial activity. Part XI.N of the MSGP pertains to Sector N facilities[7]—entities that discharge stormwater associated with industrial activity from scrap recycling and waste recycling facilities. Part XI.N is divided into three separate classes of recycling facilities. The first category is "facilities that are engaged in the processing, reclaiming and wholesale distribution of scrap and waste materials such as ferrous and nonferrous metals, paper, plastic, cardboard, glass, animal hides (these types of activities are typically identified as SIC code 5093)" ("Non-Source Separated Facilities"). 60 Fed. Reg. at 51189; *see also* 60 Fed. Reg at 51190-51193 (providing details on special requirements). The second category is "Facilities that are engaged in reclaiming and recycling liquid wastes such

---

[7] Sector N pertains to facilities with SIC Code 5093. MSGP, Table 4.

as used oil, antifreeze, mineral spirits, and industrial solvents (also identified as SIC code 5093)." *Id.* The third category is "for recycling facilities that only receive source-separated recyclable materials primarily from non-industrial and residential sources (also identified as SIC 5093) (e.g., common consumer products including paper, newspaper, glass, cardboard, plastic containers, aluminum and tin cans)" ("Source Separated Facilities"). *Id.*; *see also* 60 Fed. Reg. at 51194-51195 (providing details on special requirements). The third category "includes recycling facilities commonly referred to as material recovery facilities (MRF)." *Id.*

86.     The MSGP requires coverage for storm water discharges "from industrial activities co-located at an industrial facility." 60 Fed. Reg. 50813. Part XI.N of the MSGP further states:

> When an industrial facility, described by the above coverage provisions of this section, has industrial activities being conducted onsite that meet the description(s) of industrial activities in another section(s), that industrial facility shall comply with any and all applicable monitoring and pollution prevention plan requirements of the other section(s) in addition to all applicable requirements in this section. The monitoring and pollution prevention plan terms and conditions of this multi-sector permit are additive for industrial activities being conducted at the same industrial facility (co-located industrial activities). The operator of the facility shall determine which other monitoring and pollution prevention plan section(s) of this permit (if any) are applicable to the facility. 60 Fed. Reg. 51189

87.     Here, on information and belief, the 2060 Facility is engaged in industrial activities falling within Part XI.N of the MSGP. As noted, XI.N covers three categories of facilities. Pertinent here are two categories: Non-Source Facilities and Source Separated Facilities. On information and belief, at least one or both of these categories applies to the 2060 Facility.

88.     The 2060 Facility has large piles of materials including aluminum stored outside, as well as numerous dumpsters with various materials stored outside.

89.     On information and belief, the 2060 Facility and 2050 Facility are co-located industrial facilities under the MSGP. *See* 60 Fed. Reg. 50813. The Combined Facility must obtain MSGP coverage for each of the types of industrial activities conducted onsite. 60 Fed. Reg. 51189.

90.     Accordingly, the 2060 Facility has met the requirement for requiring coverage under Part XI.N of the MSGP. On information and belief, the 2060 Facility does not have any NPDES stormwater coverage under the MSGP. Suncoast Metals is therefore violating the CWA by discharging pollutants from point sources into navigable waters of the United States without NPDES permit authorization.

>    **2.    Suncoast Metals is violating the CWA by discharging pollutants from point sources to waters of the United States without a NPDES permit.**

91.     Because CWA's discharge prohibitions apply to the 2060 Facility, Suncoast Metals is violating the CWA by discharging pollutants from point sources into navigable waters of the United States without NPDES permit authorization.

>    **a.    Suncoast Metals is "discharging pollutants" from the 2060 Facility.**

92.     On information and belief, the 2060 Facility receives, separates, stores, bails, and then ships aluminum. On information and belief, the 2060 Facility Suncoast Metals stores materials including aluminum in outdoor, uncovered areas where they are exposed to storm water. The bins at the 2060 Facility are not watertight, so the contaminants mobilized

in the water drip onto the pavement beneath the bins. In addition, the 2060 Facility houses and stores a variety of light duty and heavy duty cars, trucks, and other transportation equipment in outdoor areas where they are exposed to storm water runoff. Outdoor service vehicles track dust, particulate matter, and other contaminants to areas on and off the premises at the 2060 Facility. These vehicles also expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

93.     On information and belief, storm water at the 2060 Facility contains chemical and industrial wastes that include, but are not limited to, TSS, COD, iron, aluminum, zinc, copper, and lead, all "pollutants" under the CWA. *See* 33 U.S.C. § 1362(6). These pollutants are being "discharged" from the 2060 Facility. The "discharge" of a pollutant means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Under CWA regulations, this includes "discharges through pipes, sewers, or other conveyances owned by a State, municipality, or other person which do not lead to a treatment works." 40 C.F.R. § 122.2.

94.     On information and belief, pollutants are picked up by storm water on the 2060 Facility and enter the various driveways leading into and out of the 2060 Facility, various surface channels at and adjacent to the 2060 Facility, at least one drop inlet and storm drain systems used to convey storm water away from the 2060 Facility. From there, these pollutants are transported either through MS4 into navigable waters and/or into Pearce Canal, which leads into Whitaker Bayou and Sarasota Bay.

95.     In addition, pollutants are also discharged from the 2060 Facility by tracking from the Defendants' motor vehicle fleet onto roadways. Once contaminated grit is

transported into public streets, storm water picks up this contaminated grit and transports the grit into Pearce Canal or the MS4s and other conveyances that lead to receiving waters.

### b. Suncoast Metals is Discharging Pollutants from a "Point Source."

96.     As noted, the 2060 Facility is drained by the various driveways leading into and out of the 2060 Facility, various surface channels at and adjacent to the 2060 Facility, and at least one drop inlet that connect with underground storm sewer pipes that discharge to receiving waters. These conveyance pipes are "point sources" under the CWA. *See* 33 U.S.C. § 1362(14).

### c. Polluted Discharges From the 2060 Facility Reach "Waters of the United States."

97.     As noted above, the polluted discharges from the 2060 Facility reach waters of the United States. These include, but are not limited to, Pearce Canal, Whitaker Bayou, Sarasota Bay, and the MS4 system, which ultimately is discharged into waters of the United States.

### d. Suncoast Metals Does Not Have NPDES Authorization for Discharges from the 2060 Facility.

98.     Despite the fact that Suncoast Metals is obligated to obtain MSGP coverage for the 2060 Facility, on information and belief, Suncoast Metals has not obtained permit coverage under the MSGP with respect to the 2060 Facility. Nor does Suncoast Metals have an individual NPDES permit authorizing its discharges of contaminated storm water from the 2060 Facility.

### e. The Dates of Suncoast Metals' Violations

99.     Defendants have discharged and are continuing to discharge pollutants to waters of the United States as described above. This discharge from the 2060 Facility was made to waters of the United States during at least every significant local rain event over 0.1 inches of rainfall since at least November 12, 2015, and that are ongoing. Attachment I to the Second Notice Letter set forth lists of specific rain dates on which Plaintiff alleges that the 2060 Facility has discharged stormwater containing impermissible and unauthorized levels of pollutants in violation of Section 301(a) of the CWA as well as Part XI.N of the MSGP.[8] This list of dates is not exclusive.

100.    Each discharge of pollutants from the 2060 Facility to waters of the United States without NPDES permit authorization constitutes a separate CWA violation. Plaintiff's violations will continue each day pollutants are discharged without a permit in violation of CWA requirements.

### ii.   ii.  Discharges in Violation of BPT/BAT/BCT Effluent Limitations

101.    CWA section 301(b), 33 U.S.C. § 1311(b), prohibits the discharge of pollutants from point sources that violate the effluent limitations imposed by that subsection. Specifically, CWA section 301(b)(1)(A), 33 U.S.C. § 1311(b)(1)(A), prohibits the discharge of pollutants from point sources that exceed a level commensurate with the application of best practicable control technology currently available ("BPT"). CWA section 301(b)(2)(A), 33 U.S.C. § 1311(b)(2)(A), prohibits the discharge of pollutants from point sources that

---

[8] The rain dates on the attached tables are all the days when 0.1" or more rain was observed at the nearest weather station to the Facility. Rain data was accessed from the National Oceanic and Atmospheric Administration at https://www.ncdc.noaa.gov/cdo-web/. (Last accessed on July 31, 2020).

exceed a level commensurate with the application of best available technology economically achievable ("BAT"). CWA section 301(b)(2)(E), 33 U.S.C. § 1311(b)(2)(E), prohibits the discharge of pollutants from point sources that exceed a level commensurate with the application of best conventional pollutant control technology ("BCT"). EPA has published Benchmark Values set at the maximum level of pollutant loading generally expected if an industrial Facility is employing BPT, BAT and BCT.[9]

102.    Plaintiff contends that the 2060 Facility has failed to employ measures that constitute BPT, BAT and BCT for Non-Source Separated Facilities and Source Separated Facilities.

103.    Because Defendants are discharging pollutants from the 2060 Facility in the absence of the implementation of BPT/BAT/BCT, Defendants are violating the effluent limitations imposed by CWA section 301(b). Defendants have discharged storm water containing excessive levels of pollutants from the 2060 Facility to waters of the United States during at least every significant local rain event over 0.1 inches of rainfall since at least November 12, 2015, and have and will occur subsequent to the date of the Second Notice Letter was served. Attachment I to the Second Notice Letter set forth lists of specific rain dates on which Notifying Party alleges that the 2060 Facility has discharged stormwater containing impermissible and unauthorized levels of pollutants in violation of Section 301(a) of the CWA as well as Part XI.N of the MSGP. This list of dates is not exclusive.

---

[9] These Benchmark Values can be found at https://www.epa.gov/sites/production/files/2015-10/documents/msgp2015_fs.pdf.

104.    Plaintiff alleges that Defendants' unlawful discharges of storm water from the 2060 Facility with levels of pollutants exceeding BPT, BAT and BCT levels of control continue to occur presently during all significant rain events. Each discharge of storm water and non-storm water from the 2060 Facility after the effective date of the BPT, BAT and BCT requirements constitutes a separate violation of the CWA. Defendants are subject to civil penalties for violations of the CWA within the past five years.

### iii.    iii.    Discharges in Violation of the MSGP.

105.    Defendants' 2060 Facility discharges storm water associated with industrial activities that is contaminated with pollutants without NPDES authorization under the MSGP. The MSGP only authorize such discharges conditioned on compliance with the terms of the MSGP, as applicable. Each of these permit terms constitutes an "effluent limitation" within the meaning of CWA section 505(f), 33 U.S.C. § 1365(f). Information available to the Plaintiff indicates that the 2060 Facility's storm water discharges have violated a number of these permit terms, thereby violating CWA effluent limitations.

### 1.    Discharges in Excess of BAT/BCT Levels.

106.    As detailed above, Part XI.N of the MSGP pertains to Sector N facilities, which includes three categories of recycling facilities with their own additional requirements. Here, one if not two classes apply to the 2060 Facility: Non-Source Separated Facilities and Source Separated Facilities. *See* 60 Fed. Reg. at 51189; *see also* 60 Fed. Reg  at 51190-51193 (providing details on special requirements for Non-Source Separated Facilities); 60 Fed. Reg. at 51194-51195 (providing details on special requirements on Source Separated Facilities).

107.    As described in more detail below, the MSGP requires dischargers to develop and implement a stormwater pollution prevention plan ("SWPPP"). MSGP § IV. Sector N Facilities such as the 2060 Facility must develop and implement a SWPPP that comports with several requirements of Part XI.N of the MSGP. Through the SWPPP, requirements in Part XI.N implement the MSGP's BAT/BCT requirements for Sector N facilities by requiring that the pollution prevention plan minimize pollution and requiring specific BMPs to effectuate such minimization. *See* MSGP Fact Sheet § VI.B, 60 Fed. Reg. at 50812 ("The pollution prevention or BMP requirements in this permit operate as limitations on effluent discharges that reflect the application of BAT/BCT.")

108.    For facilities in Sector N, the MSGP establishes the following cut-off concentrations for pollutants of concern: chemical oxygen demand ("COD") – 120 mg/L, total suspended solids ("TSS") – 100 mg/L, total recoverable aluminum – 0.75 mg/L, total recoverable copper – 0.0636 mg/L, total recoverable iron – 1.0 mg/L, total recoverable lead – 0.0816 mg/L, total recoverable zinc – 0.117 mg/L. MSGP, § XI.N.5.a; 61 Fed. Reg. 5248 (February 9, 1996) (amending cut-off concentration for zinc). The cut-off concentrations are used "to assess the effectiveness of the pollution prevention plan and to help ensure that a reduction of pollutants is realized." 60 Fed. Reg. at 50843 (Monitoring and Reporting Requirements). They "provide a reasonable target for controlling stormwater contamination by pollution prevention plans." *Id*. at 51076. Thus, the cut-off concentrations are guidelines for determining whether a facility has implemented the requisite BAT/BCT level of control measures. Further, exceedances of cut-off concentrations are reason for concern that pollution may have reached a level "at which a stormwater discharge could potentially

impair, or contribute to impairing water quality or affect human health from ingestion of water or fish." 60 Fed. Reg. at 50824–25.

109.    Plaintiff's investigation indicates that Suncoast Metals has not developed and/or implemented sufficient BMPs to minimize stormwater flows from coming into contact with the sources of contaminants or otherwise to control the discharge of pollutants from the 2060 Facility. Accordingly, Suncoast Metals has not developed and/or implemented adequate pollution controls to meet BAT/BCT at the 2060 Facility in violation of the MSGP, and has violated and will continue to violate the Clean Water Act each and every day it has failed to develop and/or implement adequate pollution controls to meet BAT/BCT. Each discharge of stormwater from each of the above facilities constitutes a separate violation of the MSGP and the CWA.

110.    Defendants have discharged storm water containing excessive levels of pollutants from the 2060 Facility to waters of the United States during at least every significant local rain event over 0.1 inches of rainfall since at least November 12, 2015, and that are ongoing. Attachment I to the Second Notice Letter set forth lists of specific rain dates on which Plaintiff alleges that the 2060 Facility has discharged stormwater containing impermissible and unauthorized levels of pollutants in violation of Section 301(a) of the CWA as well as Part XI.N of the MSGP. This list of dates is not exclusive.

111.    Plaintiff alleges that Defendants unlawful discharges of storm water from the 2060 Facility with levels of pollutants exceeding BAT and BCT levels of control continue to occur presently and will in the future continue during all significant rain events. Each discharge of storm water and non-storm water from the 2060 Facility after the effective date

of the BAT and BCT requirements constitutes a separate violation of the MSGP and the

CWA. Defendants are subject to civil penalties for violations of the MSGP and the CWA

within the past five years. Consistent with the five-year statute of limitations applicable to

citizen enforcement actions brought pursuant to the federal Clean Water Act, Suncoast

Metals is subject to penalties for violations of the MSGP and the CWA since November 12,

2015.

> 2. **Violation of MSGP Conditions Related to Development and Implementation of an Adequate Storm Water Pollution Prevention Plan.**

112.    The MSGP requires dischargers to develop and implement a SWPPP that

includes potential sources of pollution that may be reasonably expected to affect the quality

of stormwater discharges associated with industrial activity from a facility as well as BMPs

use to reduce the pollutants in stormwater discharges associated with industrial activity at a

facility. MSGP § IV, 60 Fed. Reg. at 51115–18. The MSGP provides that:

> [T]he plan shall describe and ensure the implementation of practices that are
> to be used to reduce the pollutants in stormwater discharges associated with
> industrial activity at the facility and to assure compliance with the terms and
> conditions of this permit. Facilities must implement the provisions of the
> stormwater pollution prevention plan required under this part as a condition of
> this permit. *Id.*, 60 Fed. Reg. at 51115.

113.    Part XI.N.3 of the MSGP describes the minimum standard Pollution

Prevention Plan Requirements for Sector N facilities such as the Facility. Facilities

subject to Sector N must include, *inter alia*, the following in their SWPPPs: (1)

identification of all the members of a stormwater pollution prevention team

responsible for developing and implementing the SWPPP; (2) a description of

potential pollutant sources; (3) a site map including, *inter alia*, outfall locations, types

of discharges in the drainage areas, location where significant materials are exposed to precipitation, monitoring locations, and flow directions; (4) an inventory of the types of materials at the site that may be exposed to precipitation; (5) a list of significant spills and leaks of toxic or hazardous pollutants that occurred at areas that are exposed to precipitation; (6) a summary of existing discharge sampling data; (7) a narrative description of potential pollutant sources from various activities; (8) a description and implementation of appropriate stormwater management controls (including many specific requirements). MSGP §§ XI.N.3.a.1, XI.N.3.a.2.a XI.N.3.a.2.e, XI.N.3.a.3.a.i-XI.N.3.a.3.a.xii (requirements for Non-Source Separated Facilities), XI.N.3.a.3.c.i-XI.N.3.a.3.c.iv (requirements for Source Separated Facilities).

114. Part XI.N.3.a.5 of the MSGP requires that Sector N facilities conduct, at a minimum once per year, comprehensive site compliance evaluations, include those evaluations in the SWPPP, and revised stormwater pollution prevention measures and controls accordingly based on the results of those evaluations.

115. Defendants failed to adopt SWPPPs for the 2060 Facility meeting these requirements. Defendants' failure to prepare an adequate SWPPP for the 2060 Facility in all the above respects constitute violations of the MSGP. *See* 60 Fed. Reg. at 50812, 50960 (SWPPP must specify BMPs necessary to attain BAT/BCT levels that are tailored to industry group). Defendants will continue to be in violation every day that Defendants fail to develop and implement an adequate SWPPP for the 2060

Facility. Defendants are subject to penalties for violations of the MSGP and the CWA

occurring within the past five years.

### 3. Failure to Develop and Implement an Adequate Monitoring and Implementation Plan as Required by the MSGP.

116.     The MSGP requires facility operators to implement monitoring and reporting

requirements that will allow facility operators to determine whether they have adequately

reduced the level of pollutants in stormwater runoff through the development and proper

implementation of the facility's SWPPP. For Sector N facilities, the monitoring and reporting

requirements are set forth in MSGP Part XI.N.5.

117.     Permittees with scrap recycling and waste recycling facilities must monitor

their stormwater discharges at least quarterly during the second and fourth year of the permit

term. They must provide "the date and duration (in hours) of the storm event(s) sampled;

rainfall measurements or estimates (in inches) of the storm event that generated the sampled

runoff; the duration between the storm event sampled and the end of the previous measurable

(greater than 0.1 inch (") rainfall) storm event; and an estimate of the total volume (in

gallons) of the discharge sampled." MSGP § XI.N.5.a., 60 Fed. Reg. at 51195. They must

collect samples during sampling periods of January to March, April to June, July to

September, and October to December.[10] *Id*. at XI.N.5.a(1). Samples must be "collected from

the discharge resulting from a storm event that is greater than 0.1" in magnitude and that

---

[10] Notifying Parties refer to these periods as the first, second, third and fourth quarters of a

given permit year.

occurs at least 72 hours from the previously measurable (greater than 0.1" rainfall) storm event." *Id*. at XI.N.5.a.(2).

118.    In addition to analytic monitoring, dischargers must also take quarterly samples and make visual observations of representative discharges. MSGP § XI.N.5.c, 60 Fed. Reg. at 51196–97. Dischargers must document their observations of color, odor, clarity, floating solids, settled solids, suspended solids, foam, oil sheen, and other obvious indicators of stormwater pollution at each discharge location. *Id.* These observations are to be recorded and kept onsite with the SWPPP. *Id.* Based on the results of the analytic and observational monitoring, dischargers are required to evaluate the need for additional BMPs and modifications to the facility's SWPPP. 60 Fed. Reg. at 50820–27, 50829–30.

119.    On information and belief, the 2060 Facility has failed to perform the monitoring requirements detailed herein.

120.    These violations of the MSGP are ongoing. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Suncoast Metals is subject to penalties for violations of the MSGP and the CWA's monitoring and sampling requirements since at least November 12, 2015.

### 4.  Failure to Conduct Adequate Comprehensive Site Compliance Evaluations

121.    Part XI.N.3.a.5 of the MSGP requires Sector N dischargers to conduct comprehensive site compliance evaluations at least once per year. 60 Fed. Reg. at 51995. This requires a comprehensive review of a facility and its stormwater pollution control measures. The outcome of this evaluation requires revisions to a facility's SWPPP. *Id*. On

information and belief, Plaintiff alleges that the 2060 Facility has failed to conduct such evaluations and to then appropriately revise their SWPPPs.

122.     Defendants violated and are violating the MSGP and the CWA each and every day that they operate the 2060 Facility without an adequately developed, implemented, and/or revised SWPPP in violation of MSGP Part XI.N.3 and XI.N.3.a.5. These above violations are ongoing, and Suncoast Metals is subject to civil penalties for all violations of the CWA occurring at the 2060 Facility since November 12, 2015.

**VI.    CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**Discharges of Contaminated Stormwater in Violation of**
**the MSGP's Effluent Limitations and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

123.     Suncoast Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

124.     Suncoast Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Combined Facility from discharging from the Combined Facility through implementation of BMPs that achieve BAT/BCT.

125.     Suncoast Waterkeeper is informed and believes, and thereon alleges, that discharges of stormwater containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Combined Facility occur every time stormwater discharges from the Combined Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Combined

Case 8:21-cv-00144-AAS   Document 1   Filed 01/19/21   Page 48 of 57 PageID 48

Facility is a violation of the MSGP and the CWA. *See* 60 Fed. Reg. at 50812 ("The conditions of this permit have been designed to comply with the technology-based standards of the CWA (BAT/BCT) . . . The pollution prevention or BMP requirements in this permit operate as limitations on effluent discharges that reflect the application of BAT/BCT."); *see also* MSGP § XI.N.3.a.3, 60 Fed Reg. at 51190 (requiring each facility to implement appropriate stormwater management controls). Each of the MSGP permit terms constitutes an "effluent limitation" within the meaning of CWA section 505(f), 33 U.S.C. § 1365(f).

126.    The Owners and/or Operators violate and will continue to violate the CWA and MSGP each and every time stormwater containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Combined Facility.

127.    Suncoast Waterkeeper is informed and believes, and thereon alleges, that the Owners' and/or Operators' violations of Effluent Limitations of the MSGP and the Clean Water Act are ongoing and continuous.

128.    Each day at the 2050 Facility since at least July 31, 2015 to the present, and at the 2060 Facility since at least November 12, 2015 to the present, that the Owners and/or Operators discharge stormwater containing pollutants in violation of the MSGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

129.    By committing the acts and omissions alleged above, the Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring at the 2050 Facility every day from July 31, 2015 to the present and at the 2060 Facility every day from November 12, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

130. An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of Florida, for which harm Suncoast Waterkeeper has no plain, speedy, or adequate remedy at law.

131. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

### SECOND CAUSE OF ACTION
**Defendant's Discharges of Contaminated Stormwater in Violation of
the MSGP's Receiving Water Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

132. Suncoast Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

133. Suncoast Waterkeeper is informed and believes, and thereon alleges, that discharges of stormwater containing levels of pollutants that adversely impact human health and/or the environment from the Combined Facility occur each time stormwater discharges from the Combined Facility.

134. Suncoast Waterkeeper is informed and believes, and thereon alleges, that stormwater containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the Combined Facility each time stormwater discharges from the Combined Facility.

135. The Owners and/or Operators violate and will continue to violate the MSGP's Receiving Water Limitations each and every time stormwater containing levels of pollutants

that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Combined Facility.

136.     Suncoast Waterkeeper is informed and believes, and thereon alleges, that the Owners' and/or Operators' violations of Receiving Water Limitations of the MSGP and the CWA are ongoing and continuous.

137.     Each and every violation of the MSGP's Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

138.     By committing the acts and omissions alleged above, the Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 12, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

139.     An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of Florida, for which harm they have no plain, speedy, or adequate remedy at law.

140.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

**THIRD CAUSE OF ACTION**
**Defendant's Failure to Adequately Develop, Implement, and/or**
**Revise a Storm Water Pollutant Prevention Plan in Violation of the**
**MSGP and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

141.     Suncoast Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

142.     Suncoast Waterkeeper is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to develop an adequate SWPPP for the Combined Facility, in violation of the MSGP.

143.     Suncoast Waterkeeper is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to adequately implement a SWPPP for the Combined Facility, in violation of the MSGP.

144.     Suncoast Waterkeeper is informed and believes, and thereon alleges, that Owners and/or Operators have failed and continue to fail to adequately revise a SWPPP for the Combined Facility, in violation of the MSGP.

145.     The Owners and/or Operators have been in violation of the MSGP at the 2050 Facility every day from July 31, 2015 to the present and at the 2060 Facility every day from November 12, 2015 to the present. The Owners' and/or Operators' violations of the MSGP and the CWA at the Combined Facility are ongoing and continuous.

146.     The Owners and/or Operators will continue to be in violation of the MSGP and the CWA each and every day the Owners and/or Operators fail to adequately develop, implement, and/or revise the SWPPP for the Combined Facility.

147.     Each and every violation of the MSGP's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

148.     By committing the acts and omissions alleged above, the Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring at the 2050 Facility every day from July 31, 2015 to the present and at the 2060 Facility every day from November 12, 2015 to the present, pursuant to Sections 309(d)

and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

149.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Suncoast Waterkeeper, its members, and the citizens of the State of Florida, for which harm they have no plain, speedy, or adequate remedy at law.

150.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

### FOURTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Monitoring and Reporting Plan in Violation of
the MSGP and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

151.    Suncoast Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

152.    Suncoast Waterkeeper is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to develop an adequate Monitoring & Reporting Plan ("M&RP") for the Combined Facility, in violation of the MSGP.

153.    Suncoast Waterkeeper is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to adequately implement an M&RP for the Combined Facility, in violation of the MSGP.

154.    Suncoast Waterkeeper is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to adequately revise an M&RP for the Combined Facility, in violation of the MSGP.

155.    The Owners and/or Operators have been in violation of the MSGP's

monitoring requirements at the 2050 Facility every day from July 31, 2015 to the present and

at the 2060 Facility every day from November 12, 2015 to the present.

156.   The Owners' and/or Operators' violations of its MSGP monitoring

requirements and the CWA at the Combined Facility are ongoing and continuous.

157.   The Owners and/or Operators will continue to be in violation of MSGP Part

XI.N.5 and the CWA each and every day they fail to adequately develop, implement, and/or

revise an M&RP for the Combined Facility.

158.   Each and every violation of the MSGP's M&RP requirements at the

Combined Facility is a separate and distinct violation of the CWA.

159.   By committing the acts and omissions alleged above, the Owners and/or

Operators are subject to an assessment of civil penalties for each and every violation of the

CWA occurring from November 12, 2015 to the present, pursuant to Sections 309(d) and 505

of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

160.   An action for injunctive relief under the CWA is authorized by Section 505(a)

of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged

above would irreparably harm Suncoast Waterkeeper, its members, and the citizens of the

State of Florida, for which harm they have no plain, speedy, or adequate remedy at law.

161.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

an actual controversy exists as to the rights and other legal relations of the Parties.

**FIFTH CAUSE OF ACTION**
**Defendant's Failure to obtain a NPDES permit for the 2060 Facility**
**in Violation of the MSGP and the CWA.**
**33 U.S.C. §§ 1342(p)(2)(B)**

162.   Suncoast Waterkeeper incorporates the allegations contained in the above

paragraphs as though fully set forth herein.

163.    Suncoast Waterkeeper is informed and believes, and thereon alleges, that the Owners and/or Operators of the Combined Facility have failed to obtain coverage under the MSGP for the 2060 Facility.

164.    On information and belief, the 2060 Facility is engaged in industrial activities falling within Part XI.N of the MSGP.

165.    Suncoast Waterkeeper is informed and believes, and thereon alleges, that the written request by Defendants submitted to the DEP on January 5, 2020 to modify the MSGP coverage for the 2050 Facility to include the 2060 Facility is insufficient to confer MSGP coverage to the 2060 Facility, or to the Combined Facilities.

166.    Rule 62-621.300(5)(f) provides that a facility may obtain MSGP permit coverage "after a complete Notice of Intent is submitted to the Department in accordance with paragraph 62-621.300(5)(c), F.A.C." which in turn states that "Facilities or activities seeking coverage under this generic permit shall apply to the Department on the form referenced in paragraph 62-621.300(5)(b), F.A.C., and in accordance with the Multi-Sector Generic Permit for Stormwater Discharge Associated with Industrial Activity."

167.    Defendants' January 5, 2021 letter to DEP does not complete the required Notice of Intent, and omits information that would have been required and provided by and through a proper Notice of Intent.

168.    The Owners and/or Operators have thus been in violation of the MSGP's requirements to obtain coverage at the 2060 Facility every day from November 12, 2015 to the present.

169.    The Owners' and/or Operators' violations of its requirements to obtain coverage under the MSGP and CWA at the 2060 Facility are ongoing and continuous.

170.    The Owners and/or Operators will continue to be in violation of MSGP Part XI.N.5 and the CWA each and every day they fail to obtain proper coverage under the MSGP and CWA for the 2060 Facility.

171.    By committing the acts and omissions alleged above, the Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 12, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

172.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Suncoast Waterkeeper, its members, and the citizens of the State of Florida, for which harm they have no plain, speedy, or adequate remedy at law.

173.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## VII.   <u>RELIEF REQUESTED</u>

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.    A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for its unlawful discharges of pollutants from the Combined Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements,

and for failing to comply with the substantive and procedural requirements of the MSGP and the CWA.

b.      A Court order enjoining Defendant from violating the substantive and procedural requirements of the MSGP and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.      A Court order assessing civil monetary penalties for each violation of the CWA at $37,500 per day per violation for violations occurring between August 30, 2013, and November 2, 2015, and $55,800 per day per violation for violations occurring after November 2, 2015 and assessed on or after January 13, 2020, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

d.      A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

e.      Any other relief as this Court may deem appropriate.

Dated: January 19, 2020              Respectfully submitted,

By:      _/s/ Justin Bloom_____

Justin Bloom
Trial Counsel
Florida Bar #89109
Justin Bloom Attorney at Law, PA
P.O. Box 1028
Sarasota, FL 34230
Phone: (941) 275-2922
Email: bloomesq1@gmail.com

Jason R. Flanders
AQUA TERRA AERIS LAW GROUP

*Attorneys for Plaintiff* SUNCOAST
WATERKEEPER